

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-15-00426-CR

TINA MARIE SMITH                                          APPELLANT

V.

THE STATE OF TEXAS                                         STATE

----------

### FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY
### TRIAL COURT NO. 54,854-B

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Tina Marie Smith appeals her conviction for possession of marijuana greater than four ounces and less than five pounds.[2] A jury found Appellant guilty, and the trial court assessed her punishment at two years in state

---

[1]See Tex. R. App. P. 47.4.

[2]See Tex. Health & Safety Code Ann. § 481.121(a), (b)(3) (West 2010).

jail probated for four years. Appellant contends that the trial court erred by denying her motion to suppress evidence. We will affirm.

## II. BACKGROUND

The arresting officer, Chad Harden, testified that he was employed with the Texas Department of Public Safety (DPS) over six years after attending the academy, was a certified peace officer, was certified on radar, and had advanced training in criminal interdiction. On February 22, 2014, while on routine patrol, the officer observed in his rearview mirror a blue Dodge pickup approaching from behind and believed it to be speeding. The officer confirmed the speed to be seventy-nine miles per hour in a seventy-five miles-per-hour zone by radar. This speed was a violation of the traffic law.

The policy of DPS authorized an officer to stop vehicles and issue a warning rather than a citation when the violation was between one and five miles over the speed limit. The officer made the traffic stop at about 8:16 p.m. Appellant was identified as the lone occupant and driver. While requesting her license, the officer noticed signs of hard travel such as a lot of wrappers in the vehicle, empty cigarette cartons, energy drinks, and a pillow and a blanket indicating she might have been sleeping in the vehicle. Appellant claimed the vehicle was hers. The signs, based on his police experience, indicated narcotic smuggling. Highway 287 was a known drug corridor. The officer told Appellant she was going to get a warning.

2

For safety reasons, Appellant was asked to sit in the patrol car. When Appellant stepped out of her vehicle, she said it felt good to stand up, which was another sign of hard travel.

In the patrol car, the officer ran Appellant's out-of-state driver's license, her registration and vehicle identification number, and her criminal history. The officer talked with Appellant. The computer checks took longer as Appellant was from out of state. In answer to the officer's questions, Appellant stated that she had traveled straight from Oregon House, California (north of Sacramento) and was heading to Wichita Falls. The officer was aware that that area of northern California was the site of a lot of marijuana groves. Appellant said she had left the previous day and had slept a few hours at a rest stop, yet another sign of hard travel used by narcotic smugglers to get a minimum amount of rest and keep going, rather than using motels.

The officer described Appellant as "very nervous"; he testified that she spoke with a nervous quiver and exhibited a nervous sort of laugh. Appellant stated she had a duffle bag, a suitcase, a coat, a blanket, and a pillow in the truck, all of which belonged to her. When the officer said he was looking for marijuana and narcotics and asked for her consent to search her vehicle, she asked why in a very low voice—almost a whisper—and then declined consent. She also declined his request to permit a K-9 to run around her vehicle.

At this time, the officer noticed that her breathing became rapid and her carotid artery in her neck started pulsating. Appellant was chatty until the officer

mentioned narcotics, and then she became far less so.  The officer stated that Appellant mentioned her knife and her willingness to show it to him, which he saw as a diversion.  The officer asked if she was a medical marijuana patient, and she said she was but denied having medical marijuana in her vehicle.

Appellant stepped out of the patrol car while the officer was working on the warning but paused briefly to ask the officer if she had mentioned she was a nurse.  She also said she could not be doing any of "that," which he understood to mean narcotics.  He thought her comment was a last ditch effort to try to divert the officer or to legitimize herself.

When Appellant exited the patrol car at about 8:28 p.m., the officer immediately called for a K-9 squad to perform an open air run around the vehicle.  The officer continued to work on the warning.  It took additional time because Appellant lived out of state, in California.

The officer testified that based upon all of these factors, he formed the reasonable suspicion that Appellant might be transporting narcotics.  At about 8:38 p.m., about twenty-two minutes after the time of the initial traffic stop and a normal period of time for issuing a warning, the officer completed the work on the warning but had not yet printed it out.

The officer stepped out of his patrol car, advised Appellant a K-9 unit was en route and would arrive within about five minutes, and allowed her to get her jacket out of the vehicle.  The officer asked if she had ever had narcotics in her vehicle, and she responded in the affirmative.  She also said her son had helped

4

her pack the locked duffle bag in which the marijuana was subsequently found. In the officer's opinion, Appellant was distancing herself from the bag with this statement. At about 8:42 p.m., the K-9 arrived and alerted on Appellant's vehicle, whereupon a search was conducted and the marijuana found behind the driver's seat. Appellant was placed under arrest.

## III. STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex.

Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

## IV. ANALYSIS

Appellant contends that the trial court should have suppressed the evidence found in her vehicle because the traffic stop for speeding lacked reasonable suspicion or probable cause, rendering the detention and subsequent search of the vehicle invalid.

We determine the lawfulness of a traffic stop from the nature of the encounter. *See Wade v. State*, 422 S.W.3d 661, 667 (Tex. Crim. App. 2013). In

*Wade*, the court reemphasized the three distinct types of police-citizen interactions:

> (1) consensual encounters that do not implicate the Fourth Amendment; (2) investigative detentions that are Fourth Amendment seizures of limited scope and duration that must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures, that are reasonable only if supported by probable cause.

*Id.* The officer's encounter with Appellant resulted from a traffic violation and involved an investigative detention that required reasonable suspicion of criminal activity, not probable cause, a higher standard. *See Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015) ("An officer may make a warrantless traffic stop if the 'reasonable suspicion' standard is satisfied.").

It is well settled that a police officer has reasonable suspicion for a detention if he has specific, articulable facts that, when combined with rational inferences from those facts, lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity. *Wade*, 422 S.W.3d at 668. This standard looks to the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002).

Appellate courts analyze the legality of traffic stops for Fourth Amendment purposes under the two-prong test articulated by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). The court must examine whether the officer's decision to stop the vehicle was justified at its inception and then determine whether the officer's subsequent actions were reasonably related in

7

length and scope to the circumstances that caused him to stop the vehicle in the first place. *Id.* at 19–20, 88 S. Ct. at 1979.

As to the first step in the inquiry, it is well established that an officer may lawfully stop and reasonably detain a person for a traffic violation if he has a reasonable suspicion that a traffic violation is in progress or has been committed. *See Jaganathan*, 479 S.W.3d at 247. In *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015), the Court stated that a "seizure for a traffic violation justifies a police investigation of that violation." A traffic stop is a detention and must be reasonable under the United States and Texas Constitutions. *Caraway v. State*, 255 S.W.3d 302, 307 (Tex. App.—Eastland 2008, no pet.).

This court addressed reasonable suspicion in *State v. Torrez*, 490 S.W.3d 279, 283–84 (Tex. App.—Fort Worth 2016, pet. ref'd), when it stated:

> The legality of a traffic stop based on reasonable suspicion does not depend upon a showing that an actual offense was committed; it is sufficient to show that the officer reasonably believed that an offense was in progress. Thus, at a suppression hearing, the State need not establish that a crime occurred prior to the investigatory stop but must elicit testimony showing sufficient facts to prove that reasonable suspicion existed that a particular person was engaged in criminal activity. [Citation omitted.]

In *Gulledge v. State*, an officer observed a vehicle traveling at a high rate of speed and checked his radar readout at fifty-four miles per hour in a forty mile-per-hour zone. No. 02-15-00196-CR, 2016 WL 551957, at *1 (Tex. App.—Fort Worth Feb. 11, 2016, pet. ref'd) (mem. op., not designated for publication). The appellant challenged the reasonableness of the stop on the ground that the

officer failed to articulate specific facts that supported reasonable suspicion or probable cause that the appellant violated section 545.351 of the Texas Transportation Code. *Id.* at *2; *see* Tex. Transp. Code Ann. § 545.351 (West 2011). The court held the officer presented evidence that the appellant was traveling over the speed limit and that under section 545.352, evidence a driver exceeds a speed limit set in accordance with the transportation code constitutes "prima facie evidence that the speed is not reasonable and prudent and that the speed is unlawful." *Gulledge*, 2016 WL 551957, at *3; *see* Tex. Transp. Code Ann. § 545.352 (West Supp. 2016). Appellant makes a similar challenge to the application of section 545.352 in the instant case. We agree with the court's analysis in *Gulledge* and conclude Appellant's challenge is without merit.

The officer both observed Appellant's vehicle speeding and verified the speed by radar as seventy-nine miles per hour in a seventy-five miles-per-hour zone, clearly a traffic violation. *See Gulledge*, 2016 WL 551957, at *3; *see also Warren v. State*, No. 05-08-01431-CR, 2009 WL 3467013, at *4 (Tex. App.—Dallas Oct. 29, 2009, no pet.) (not designated for publication) (concluding that officer had reasonable suspicion that defendant was violating section 545.351 because radar showed defendant was traveling seventy miles per hour in a sixty-five mile-per-hour zone).

We conclude the officer testified to specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that Appellant had engaged in criminal activity—speeding—and that the

9

officer had reasonable suspicion to lawfully stop Appellant's vehicle. *See Gulledge*, 2016 WL 551957, at *3; *see also Nnamani v. State*, No. 02-15-00429-CR, 2016 WL 6803384, at *6–7 (Tex. App.—Fort Worth Nov. 17, 2016, no pet.) (mem. op., not designated for publication); *Kimbell v. State*, No. 05-11-01211-CR, 2013 WL 4568049, at *4 (Tex. App.—Dallas Aug. 26, 2013, pet. ref'd) (not designated for publication). As the officer lawfully stopped the vehicle based on reasonable suspicion, any issue of probable cause is moot. Appellant's issues one and two are without merit.

Appellant next argues that the officer unreasonably prolonged the detention in violation of the Fourth Amendment. The general rule is that if an officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle and if he detains the driver beyond the time needed to investigate the circumstances that caused the stop, the detention is unlawful unless he develops reasonable suspicion of additional criminal activity in the meantime. *See State v. Tucker*, No. 13-15-00491-CR, 2016 WL 2609310, at *6 (Tex. App.—Corpus Christi May 5, 2016, pet. ref'd) (mem. op., not designated for publication). In the event the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain the driver for a reasonable time while appropriately attempting to dispel the officer's reasonable suspicion. *State v. Urias*, No. 08-15-00176-CR, 2016 WL 3639977, at *4 (Tex. App.—El Paso July 6, 2016, no pet.) (not designated for publication).

10

To be reasonable, the traffic stop must be temporary and last no longer than necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983). Reasonableness is measured in objective terms by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 421 (1996). If during the ensuing investigation, the officer develops reasonable suspicion that another violation has occurred, the scope of the initial investigation expands to include the new offense. *Goudeau v. State*, 209 S.W.3d 713, 719 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

In *Rodriguez,* the Supreme Court reaffirmed that while investigating a traffic stop, an officer may examine driver's licenses and vehicle registrations and run computer checks as part of his investigation of the circumstances that originally caused the stop. 135 S. Ct. at 1615. The officer may also ask about the purpose and itinerary of the occupants' trip as part of this investigation as long as the questions do not extend the duration of the stop. *See Kothe v. State*, 152 S.W.3d 54, 64 n.36 (Tex. Crim. App. 2004). The Fourth Amendment protects against detention, not questioning. *St. George v. State*, 197 S.W.3d 806, 819 (Tex. App.—Fort Worth 2006) (en banc op. on reh'g), *aff'd*, 237 S.W.3d 720 (Tex. Crim. App. 2007). Thus, no Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions that are unrelated to his reason for stopping the vehicle while waiting for routine computer checks to be

processed. *See Fisher v. State*, 481 S.W.3d 403, 411 n.7 (Tex. App.—Texarkana 2015, pet. ref'd).

Our analysis must focus upon whether the officer developed reasonable suspicion of additional criminal activity during his initial investigation to warrant prolonging the detention several minutes to accommodate the dog sniff. In its brief, the State identified the following facts and inferences to justify reasonable suspicion of criminal activity which the officer gathered before he called for the K-9 unit:

- Appellant was travelling on [Highway] 287, which in Trooper Harden's training and experience is a drug corridor;

- Appellant's "hard travel"—empty cigarette cartons, energy drinks, a pillow and blanket, driving straight from California, and sleeping at a rest stop as a female traveling on her own, which in Trooper Harden's experience, is a sign of possible narcotics trafficking;

- The origin of Appellant's trip, northern California, was known to Trooper Harden as a locale for marijuana groves;

- Appellant's unusual degree of nervousness, laughing for no apparent reason;

- Appellant's short, rapid breathing and visible pulse in her neck after Trooper Harden requested consent to search her vehicle;

- The change in Appellant's tone and volume in response to a request for consent to search;

- Answering that she had a medical marijuana card;

- After denying consent to search the vehicle twice, offering to retrieve and show a knife to Trooper Harden, which was unusual in Harden's experience; and . . .

12

- Appellant's "last ditch effort" to convince Trooper Harden that there wasn't narcotics in the vehicle by volunteering that Appellant is a nurse and "she's not allowed to do that." [Footnotes omitted.]

This summary of relevant evidence shows the route traveled was a drug corridor, the mode of travel was described as "hard travel" (energy food and drink, pillows, sleep in the car at rest stop), the origin of travel was a location of known marijuana groves, Appellant exhibited extreme nervousness and visibly rapid breathing when asked to consent to search, and Appellant volunteered various information the officer believed was designed to distract him from pursuing his investigation. This evidence showed the existence of objectively reasonable articulable suspicion of illegal activity beyond a traffic violation and warranted the detention of Appellant's vehicle pending the arrival of the K-9 unit.

We, therefore, conclude the circumstances here show the actions taken by the officer, including the length and scope of the detention, were reasonable, and the dog sniff conducted in this case did not unreasonably prolong the detention and was valid under the Fourth Amendment. *See Goudeau*, 209 S.W.3d at 719. Appellant's issues three through five are without merit.

Appellant complains that her constitutional right to travel protected by the Equal Protection Clause of the Fourteenth Amendment was violated as the search was conducted in part because Appellant was a California resident. A citizen's right to travel, relied upon by Appellant, should not be construed to provide a refuge for the travel activities of a drug courier.

13

Appellant misconstrues the evidence. The officer testified he did not stop Appellant because she was a California resident. The officer instead testified that he was aware the place Appellant started from (Oregon House, California, north of Sacramento) was the site of a lot of marijuana groves. He also noted Appellant had a medical marijuana card issued by that state. We conclude these facts do not implicate Appellant's equal protection rights to travel. Appellant's sixth issue is without merit.

Appellant complains of certain of the trial court's findings of fact and conclusions of law in two separate issues. This court's review of the record comports with the carefully detailed findings of fact and conclusions of law of the trial court. Any deviations of the findings and conclusions are minimal and immaterial and would not affect this court's resolution and disposition of the issues presented in this case. *See* Tex. R. App. P. 44.2(b). Appellant's seventh and eighth issues are without merit.

In her last issue, Appellant argues that her failure to object to the fruits of the search did not waive her challenges to the search and seizure. At trial, when the State offered the marijuana into evidence, Appellant stated "no objection." On appeal, the State does not contest preservation. Although certain strategic benefits may accrue to a defendant when counsel voices "no objection" to the

admission of evidence in the presence of the jury, we nevertheless addressed each issue presented.[3]  This issue is, therefore, moot.

## V. CONCLUSION

As we have resolved each of Appellant's issues against her, we affirm the trial court's judgment.

/s/ Kerry P. FitzGerald

KERRY P. FITZGERALD
JUSTICE

PANEL:   GABRIEL and KERR, JJ.; and KERRY P. FITZGERALD (Senior Justice, Retired, Sitting by Assignment).

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  April 6, 2017

---

[3]In *Thomas v. State*, 408 S.W.3d 877, 885–86 (Tex. Crim. App. 2013), the court stated,

> We therefore hold that . . . the rule that a later statement of "no objection" will forfeit earlier-preserved error is context-dependent. By that we mean that an appellate court should not focus exclusively on the statement itself, in isolation, but should consider it in the context of the entirety of the record.  If the record as a whole plainly demonstrates that the defendant did not intend . . . his "no objection" statement to constitute an abandonment of a claim of error that he had earlier preserved for appeal, then the appellate court should not regard the claim as "waived," but should resolve it on the merits.  On the other hand, if from the record . . . the appellate court simply cannot tell whether an abandonment was intended or understood, then . . . it should regard the "no objection" statement to be a waiver of the earlier-preserved error.  Under the latter circumstances, the affirmative "no objection" statement will . . . serve as an unequivocal indication that a waiver was both intended and understood.

15